**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| LAWRENCE A. RENNETTE, | CASE NO. 1:24-CV-01530 |
| Plaintiff, | |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | |

Plaintiff Lawrence A. Rennette ("Plaintiff" or "Mr. Rennette") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter is before the undersigned by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  (ECF Doc. 7.)

For the reasons set forth below, the final decision of the Commissioner is **VACATED** and **REMANDED**, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Order.  On remand, the ALJ should clearly articulate the rationale for her findings regarding the persuasiveness of the medical opinions and comply with SSR 96-8p's requirement that she explain any decisions not to adopt medical source opinions that conflict with the RFC.

1

## I.      Procedural History

On May 15, 2019, Mr. Rennette filed applications for DIB and SSI, alleging a disability onset date of October 14, 2018.  (Tr. 92-93, 189-202, 2027.)  He alleged disability due to schizophrenia and depression.  (Tr. 60, 76, 95, 109, 124, 134, 225.)  Mr. Rennette's applications were denied initially (Tr. 124-26, 127-29) and upon reconsideration (Tr. 134-40, 141-45).  Plaintiff filed a request for hearing.  (Tr. 146-47.)  Following a September 29, 2020 telephonic hearing before an Administrative Law Judge ("ALJ") (Tr. 15, 32-57), the ALJ issued a decision on October 9, 2020, finding Mr. Rennette had not been under a disability within the meaning of the Social Security Act from October 14, 2018, through the date of the decision (Tr. 12-31).  The Appeals Council found no reason to review the decision, which became the final decision of the Commissioner.  (Tr. 1-6.)  Mr. Rennette appealed to the United States District Court and the case was remanded on January 20, 2022, based on the parties' stipulation.  (Tr. 1-6, 677-80.)  The Appeals Council issued a remand order on June 19, 2022.  (Tr. 672-76.)

A new telephonic hearing was held before the ALJ on October 12, 2022.  (Tr. 621-51, 2095.)  On November 1, 2022, the ALJ issued a decision finding Mr. Rennette had not been under a disability within the meaning of the Social Security Act from October 14, 2018, through the date of the decision.  (Tr. 595-620.)  After an appeal to the United States District Court, the case was again remanded pursuant to a joint stipulation on July 21, 2023.  (Tr. 2125.)  The Appeals Council issued a remand order on November 9, 2023.  (Tr. 2118-24.)

The matter was assigned to a new ALJ, who conducted a telephonic hearing on March 25, 2024.  (Tr. 2068-91.)  On June 20, 2024, the ALJ issued a decision finding Mr. Rennette had not been under a disability within the meaning of the Social Security Act from October 14, 2018, through the date of the decision.  (Tr. 2024-67.)  Mr. Rennette filed the instant Complaint in this

Court on September 9, 2024, challenging the Commissioner's final decision denying his social security disability benefits.  (ECF Doc. 1.)  The matter is fully briefed.  (ECF Docs. 8, 10, & 11.)

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Mr. Rennette was born in 1973.  (Tr. 39, 189.)  He graduated from high school.  (Tr. 39, 226, 627.)  He last worked in 2018 as an electronics recycler, working in that full-time position for a year and a half.  (Tr. 40.)  He also worked as a store laborer and gate guard.  (Tr. 2060.)

### B.     Medical Evidence

#### 1.     Relevant Treatment History[1]

On August 17, 2018, Mr. Rennette's family brought him to the emergency room at Lutheran Hospital to detox from alcohol.  (Tr. 295.)  He had not gone to work for several weeks and was drinking in the morning for bilateral hand tremors; he reported drinking daily for several years.  (*Id*.)  He denied prior psychiatric treatment but said his primary care physician previously prescribed Zoloft and Paxil.  (*Id*.)  He reported chronic voices, but described the voices as normal and said they did not interfere with his functioning.  (*Id*.)  He was divorced and lived alone, but his father called him daily.  (*Id*.)  He did not socialize outside of work and spent his time off drinking and playing videogames.  (*Id*.)  He was admitted to the hospital and completed a one-week detox before being discharged on August 22, 2018.  (Tr. 385.)

On September 4, 2018, Mr. Rennette presented to Southwest General Hospital's chemical dependency intensive outpatient program ("IOP") for help with recovery from alcohol use disorder.  (*Id*.)  Raman Baishnab, D.O., completed a psychiatric assessment on September 12,

---

[1] Because the Court finds remand is warranted based on the ALJ's evaluation of the state agency psychological consultants' medical opinions, *see* Section VI.B., *infra*, the Court's evidentiary summary will focus on the records relating to Mr. Rennette's mental impairments.

2018.  (*Id*.)  Mr. Rennette reported that he was divorced but maintained a relationship with his ex-wife's children, who were adults.  (*Id*.)  He had been working full-time for an electronic recycling company for fifteen months.  (*Id*.)  He reported binge drinking for three weeks.  (*Id*.)  He admitted to consuming 8-14 beers per day since 2003.  (*Id*.)  He also reported daily marijuana use since he was 14 years old, stating he last used marijuana prior to his recent admission at Lutheran Hospital.[2]  (Tr. 387.)  He complained of depression, anxiety, and sleep disorder, stating he slept 2-3 hours per night.  (Tr. 385.)  He reported depression since he was 14 years old when a grade school friend committed suicide; but he "really 'shut down'" starting in 2014 when his closest friend committed suicide.  (*Id*.)  He reported no current psychiatric treatment but two prior psychiatric admissions, one when he was 18 years old and another when he was in his early twenties, and four past suicide attempts.  (Tr. 385-86.)  His prior psychiatric medications included Zoloft, Prozac, and Paxil.[3]  (Tr. 386.)  He said Paxil worked very well, noting that he was social and productive for several years while he was taking it.  (*Id*.)  He had stopped taking Paxil due to the cost and had not taken it since 1993.  (*Id*.)  On examination, he was pleasant and cooperative, casually groomed and dressed, mildly malodorous, tall, thin, and appeared ten years older than his age.  (Tr. 388.)  His eye contact was good.  (*Id*.)  His speech was clear and spontaneous, with normal rate and volume, but mildly pressured.  (*Id*.)  His thought process was tangential, future-oriented, and goal-directed.  (Tr. 389.)  His thought content and associations included anxious and depressive themes with some hope and optimism regarding recovery.  (*Id*.)  There were no apparent delusions, and he did not appear responsive to auditory or visual hallucinations or internally stimulated; but he reported a history of auditory and visual

---

[2] He also reported a history of using other drugs, including LSD, cocaine, crack cocaine, and opioids.  (Tr. 387.)

[3] He also reported abusing Valium for a few months.  (Tr. 386.)

hallucinations. (*Id.*) No current suicidal ideation was elicited or observed. (*Id.*) His mood was anxious and depressed, and his affect was mood congruent and constricted. (*Id.*) His memory and attention were intact, his language and fund of knowledge were average, and his judgment and insight were fair. (*Id.*) Mr. Rennette was diagnosed with: alcohol use disorder, severe; cannabis use disorder, severe; cocaine use disorder, moderate; schizoaffective disorder, depressive type; and tobacco use disorder, severe. (Tr. 389-90.) He was started on paroxetine and trazodone. (Tr. 390.) He entered the IOP and was advised to continue attending AA meetings and get a sponsor. (*Id.*)

As part of his IOP, urine testing was conducted and reported from September 4 to 30, 2018 (Tr. 374-84), October 1 to 31, 2018 (Tr. 392-96), November 15 to 30, 2018 (Tr. 397-400), December 13 to 31, 2018 (Tr. 401-04), January 1 to 31, 2019 (Tr. 405-16), February 1 to 28, 2019 (Tr. 417-23), March 1 to 31, 2019 (Tr. 424-31), April 1 to 30, 2019 (Tr. 432-36), May 1 to 31, 2019 (Tr. 437-41), and June 1 to 30, 2019 (Tr. 442-45). His urine screen was positive for alcohol and marijuana on October 8, 2018, and he was admitted to Catholic Charities, Matt Talbot Residential Treatment for Men, that month due to continued drug and alcohol abuse (Tr. 393, 512-17). Plaintiff's urinalysis was negative, and he required no psychiatric treatment from November 2018 through February 2019 (Tr. 398, 402, 406, 410, 414, 418, 422), but he resumed using alcohol and marijuana in March 2019 (Tr. 425, 429) and April 2019 (Tr. 433). Mr. Rennette attended cognitive group therapy in May 2019 (Tr. 365-66), but his urine screens in May were positive for alcohol and marijuana (Tr. 438). During group therapy in May, he was attentive and engaged, but also sarcastic and superficial, attention seeking, and disruptive. (Tr. 365-66.) He justified getting high as a better option than suicide. (Tr. 367.) He said he was not

willing to return to residential treatment.  (*Id*.)  His urine screen on June 17, 2019, was positive for alcohol and marijuana.  (Tr. 443.)

On June 28, 2019, Mr. Rennette presented to Tim Collins, LSW, at the Center for Families & Children.  (Tr. 469-75, 482-83.)  He reported current stressors that included having no friends and no outside social support other than his parents.  (Tr. 471.)  He felt he could not talk with his parents about his problems because he was concerned that he would worry them. (*Id*.)  He had lost multiple friends, was divorced, and felt inadequate given his age and the fact that he rented rather than owned a home.  (*Id*.)  He reported a history of alcohol and marijuana use.  (Tr. 474.)  He also reported feelings of worthlessness, low energy, lack of motivation, past suicidal thoughts and attempts, and auditory and visual hallucinations that were not command type.  (Tr. 471, 474.)  He was diagnosed with schizoaffective disorder, depressive type, and referred to psychiatry and behavioral health counseling.  (Tr. 469, 474.)

On July 16, 2019, Mr. Rennette presented to Derek Dickson, LPC, at the Center for Families & Children for individual therapy.  (Tr. 480-81.)  He had an appropriate appearance and affect and was actively engaged and participated in the session.  (Tr. 480.)

On August 2, 2019, Mr. Rennette returned to LPC Dickson for therapy.  (Tr. 478-79.)  He had an appropriate appearance and affect and was actively engaged and participated in the session.   (Tr. 478.)  He reported anxiety and depressive symptoms over the previous week, but was engaged in identifying coping skills to manage these symptoms.  (*Id*.)  He reported walking, biking, and watching television as coping skills.  (*Id*.)  His goal for the upcoming week was to "get out and do things."  (*Id*.)  Mr. Rennette returned to LPC Dickson on August 19, 2019.  (Tr. 476-77.)  He had an appropriate appearance and affect and was actively engaged and participated

in the session.  (Tr. 476.)  He reported his anxiety and depression were in the "middle 5/10."
(*Id*.)  He engaged in identifying coping mechanisms for his symptoms.  (*Id*.)

On August 26, 2019, Mr. Rennette presented to pharmacist Evan Wright, PharmD, at
Circle Health Services West Behavioral Health ("Circle Health") for a medication check.  (Tr.
562.)  Dr. Wright noted that Mr. Rennette was stable and well controlled on his current regimen,
which included olanzapine, paroxetine, naltrexone.  (*Id*.)  Mr. Rennette reported that he was
compliant with his medications most of the time and there were no side effects.  (Tr. 563.)  His
mood was neutral, and he reported no issues with sleep, a normal appetite, and that he walked for
exercise.  (*Id*.)  No changes were made to Mr. Rennette's medications.  (*Id*.)

On September 30, 2019, Mr. Rennette presented to Tiffany Gee, M.D., at Circle Health
for medication management and follow up regarding anxiety, depression, and alcohol use
disorder.  (Tr. 559.)  He reported that things were "not too bad."  (*Id*.)  He felt individual
counseling was going well.  (*Id*.)  He was attending four AA meetings a week and continued to
be sober from alcohol, but he was using marijuana nightly to help him relax and fall asleep.  (*Id*.)
He went to his parents' house weekly.  (*Id*.)  He reported auditory hallucinations a few times a
month that were not distressing to him.  (Tr. 559-60.)  The voices said his name and were not
command in nature.  (Tr. 560.)  He did not want to increase Zyprexa (olanzapine) due to
metabolic side effects.  (*Id*.)  On examination, Mr. Rennette was calm, cooperative, and engaged
with good eye contact.  (*Id*.)  His mood was euthymic, and his affect was stable and full range,
with inappropriate sarcastic humor at times.  (*Id*.)  His thought process was coherent, logical, and
linear.  (*Id*.)  He denied suicidal and homicidal thoughts, desires, or intent.  (*Id*.)  He was alert
and oriented with fair insight and judgment.  (*Id*.)  Mr. Rennette's diagnoses included
schizoaffective disorder, depressed type, and unspecified anxiety.  (*Id*.)  Dr. Gee concluded that

Mr. Rennette remained psychiatrically stable.  (Tr. 560.)  She continued his medications and recommended that he continue individual counseling and alcohol/drug treatment.  (Tr. 560-61.)

During an individual counseling session with LPC Dickson on November 8, 2019, Mr. Rennette presented as sad or depressed.  (Tr. 558.)  They explored Mr. Rennette's feelings of depression and anxiety, working on reframing his thoughts to improve his feelings.  (*Id.*)  They also worked on goal setting regarding his stressors and breaking things down into smaller tasks to make them more manageable, to decrease his levels of anxiety and depression.  (*Id.*)

On November 25, 2019, Mr. Rennette presented to Natasa Zivak, PharmD, at Circle Health.  (Tr. 553-54.)  He continued to report auditory hallucinations that were not distressing to him.  (Tr. 554.)  He also reported recent visual hallucinations, including a fire truck that was not there.  (*Id.*)  The recent visual hallucinations were making him question whether the things he saw on a daily basis were real.  (*Id.*) He was interested in increasing his olanzapine even if it meant the potential for weight gain.  (*Id.*)  Dr. Zivak planned to speak with Dr. Gee regarding possible medication changes.  (*Id.*)  Mr. Rennette also reported recent suicidal ideation, indicating he had a plan but did not act on it because he did not want to hurt his family.  (*Id.*)  He was living alone but talked to his family daily.  (*Id.*)  He reported decreased cravings for alcohol, and was no longer using marijuana.  (*Id.*)  He was taking melatonin as needed for sleep.  (*Id.*)  Mr. Rennette also met with LPC Dickson for counseling on November 25, 2019.  (Tr. 556-57.)  His mood was depressed.  (Tr. 557.)  Mr. Rennette said he felt better when he was at his parents or not alone.  (*Id.*)  LPC Dickson worked with Mr. Rennette on learning ways to increase his support system, including his parents, AA, and church groups.  (*Id.*)

Mr. Rennette continued to receive IOP and other treatment services through Circle Health, including individual counseling through October 2021.  (Tr. 519, 526-27, 529-30, 531-

32, 536, 538, 539, 541, 545, 547, 548, 552, 1245-47, 1570-71, 1615-16, 1619-20, 1664, 1692-93, 1740-43.)[4]  At times, he presented with an appropriate appearance, affect, and/or mood (Tr. 536, 548, 552, 1664), but he generally appeared sad or depressed at individual counseling sessions during this period.[5] (Tr. 519, 526, 530, 532, 538, 539, 541, 545, 547.)  During this period, he also attended appointments with psychiatric providers at Circle Health for follow up and medication management.  (Tr. 521-23, 524-26, 533-35, 542-44, 549-52, 1745-49, 1879-83, 1971-74.)  Mr. Rennette also attended group substance abuse counseling from August 2020 through September 2021.  (Tr. 1273-90, 1341-1461, 1465-76, 1484-91, 1497-1504, 1515-17, 1520-53, 1560-62, 1573-76, 1595-1600, 1612-13, 1620-32, 1639-45, 1651-61, 1669-84, 1688-90, 1699-1739, 1750-61, 1765-1840, 1851-77, 1887-1911, 1922-69, 1976-88, 1992-2011.)

At medication management visits with Dr. Gee in December 2019, January 2020, and March 2020, Mr. Rennette reported he continued to struggle with his sobriety and was drinking periodically.  (Tr. 533-34, 542, 550.)  Mental status examination findings were normal.  (Tr. 534, 543, 550.)  At his January 27, 2020, appointment, Dr. Gee discontinued naltrexone given Mr. Rennette's continued alcohol use.  (Tr. 543-44.)  Paxil and Zyprexa were continued.  (*Id.*)

On June 15, 2020, Mr. Rennette told to Dr. Gee that everything was going well.  (Tr. 524.)  However, he reported that the voices he had been hearing for thirty years stopped when he took his medication.  (*Id.*)  He stopped taking his medications for two and a half days at the end of May because he felt lonely without the voices and wanted them to keep him company.  (*Id.*)  Then he immediately started drinking again and passed out.  (*Id.*)  After waking up, he realized he had put himself in danger and could have injured himself; he concluded that not taking his

---

[4] Many of the Mr. Rennette's counseling sessions during this period were conducted via telehealth.

[5] During a March 23, 2021, counseling session with LPC Dickson, Mr. Rennette presented as anxious.  (Tr. 1616.)  He reported being stressed about his "roommate and moving back in with parents."  (*Id.*)

medications was no longer worth the risk.  (*Id*.)  He felt remorseful, sad, and mad at himself, but also grateful he was not seriously injured.  (*Id*.)  He restarted his mediations without issue and reported doing well since resuming his medications.  (*Id*.)  He reported no issues with his mood or anxiety and no hallucinations.  (*Id*.)  Mental status findings were normal.  (Tr. 524-25.)

On July 20, 2020, Mr. Rennette met with psychiatrist Alyssa Beda, M.D., at Circle Health for a follow-up telehealth appointment.  (Tr. 521.)  He reported his mood was "really good," and he felt "centered instead of 'up and down.'"  (*Id*.)  He was doing better with both abstinence from alcohol and medication compliance and was still involved in an IOP.  (Tr. 522-23.)  Mental status findings were normal.  (*Id*.)  He told Dr. Beda he had been unemployed since February 2019.  (Tr. 521-22.)  Dr. Beda diagnosed Mr. Rennette with schizoaffective disorder, depressed type, unspecified anxiety, and substance use disorder (cannabis, alcohol).  (Tr. 522-23.)  She continued his prescriptions for Paxil and Zyprexa.  (Tr. 523.)

On August 31, 2020, Mr. Rennette met with Dr. Beda for a follow-up telehealth visit.  (Tr. 1971.)  He reported he was "not too bad."  (Tr. 1972.)  He was attending AA meetings and taking his medications.  (*Id*.)  His mental status examinations were normal.  (*Id*.)  He met with Dr. Beda again in October 2020 (Tr. 1879-83) and January 2021 (Tr. 1745-49).  When he met with Dr. Beda on October 19, 2020, his mental examination findings were normal except he reported fleeting thoughts of death / passive suicidal ideation the day he learned he was denied disability; but he intended to keep pushing forward and wanted to live.  (Tr. 1880.)  Dr. Beda indicated that Mr. Rennette was stable on his medications when compliant.  (Tr. 1881.)  When Mr. Rennette met with Dr. Beda on January 11, 2021, he reported that he was moving out of his father's condo and into his parents' basement.  (Tr. 1745-46.)  He felt some distress about the move but was also looking forward to not being with his roommate.  (Tr. 1746.)  His disability

claim was denied for a third time and he said he feared he would have to go back to work if it was denied again.  (*Id*.)  His mental status findings were normal except for fleeting thoughts of death / passive suicidal ideation the day he learned he was denied disability, with an intent to keep pushing forward and a desire to live.  (*Id*.)  Dr. Beda indicated that Mr. Rennette was stable on his medications when compliant and was attending AA meetings and an IOP.  (Tr. 1747.)  Dr. Beda continued Mr. Rennette's medications.  (*Id*.)

Mr. Rennette returned to Dr. Beda on March 29, 2021, for a telehealth session via phone. (Tr. 1586.)  He reported side effects from taking 40 mg of Paxil; he was getting dizzy and lightheaded and said he "flop[ped] around like a fish."  (Tr. 1587.)  Mental status findings were normal except that Mr. Rennette reported fleeting thoughts of suicide the day he learned he was denied disability.  (Tr. 1589.)  It was suspected that his medications were playing a role in his orthostatic hypotension / dizziness, but Mr. Rennette knew he needed his medications because his hallucinations returned when he missed a few doses of Zyprexa.  (*Id*.)  His Paxil was decreased from 40 mg to 20 mg and he was referred to neurology for dizzy spells.  (Tr. 1589-90.)

On September 21, 2021, Mr. Rennette met with Rachael Meier, Pharm.D., via telephone for medication refills.  (Tr. 1260-61.)  Mr. Rennette reported he was taking his medications as prescribed.  (Tr. 1261.)  But he also reported running out of olanzapine two days earlier; he noticed mood swings, feeling angrier, and auditory and visual hallucinations since running out. (Tr. 1261.)  Before running out of his medication, he reported a stable mood.  (*Id*.)  He denied dizziness or falls since starting meclizine, but said he was still having orthostatic hypotension. (*Id*.)  He reported good appetite and sleep.  (*Id*.)  He denied illicit drug use but reported "drinking on occasion, nothing excessive."  (*Id*.)  His prescription for olanzapine was refilled.  (*Id*.)

On October 4, 2021, Mr. Rennette was discharged from the IOP, with recommendations to stay abstinent and engaged in AA support groups and to continue with his mental health care and medication regimen.  (Tr. 1245-47, 1254.)

On October 6, 2021, Mr. Rennette presented to Rachel Kulhanek, PMHNP, at Circle Health for a telehealth follow-up appointment and medication management.[6]  (Tr. 1235.)  Mr. Rennette's father was present during the appointment.  (*Id*.)  He reported that he graduated from IOP but was still going on Mondays and periodically throughout the week.  (*Id*.)  He reported taking Paxil for his depression and said he was doing well.  (*Id*.)  He denied crying spells and suicidal ideation.  (*Id*.)  He was also taking Zyprexa, which helped him sleep and reduced his nightmares.  (Tr. 1236.)  He denied symptoms of anxiety and mania.  (Tr. 1235, 1238.)  He reported past conflict with his roommate; prior to his roommate moving out, he had "fleeting" homicidal ideation towards his roommate with a plan of using a knife.  (*Id*.)  He denied intent to harm his roommate because he feared the consequences, and denied having access to his roommate because he was no longer living with him.  (Tr. 1238.)  His coping mechanisms included walking, bike riding, spending time with his parents on the weekends, and talking periodically to his older brother and younger sister.  (Tr. 1236.)  He reported occasional auditory hallucinations of music or voices but said the symptoms were manageable.  (Tr. 1236, 1238.)  On examination, he was neat and clean and dressed appropriately.  (Tr. 1238.)  He was cooperative and engaged with normal speech.  (*Id*.)  His thought process was goal-directed, linear, and coherent.  (*Id*.)  His eye contact was good.  (*Id*.)  He was oriented with a euthymic mood and constricted affect.  (*Id*.)  His cognition was intact, his insight was good, and no impairment in judgment was noted.  (*Id*.)  He was diagnosed with schizoaffective disorder, depressive type.

---

[6] Mr. Rennette's care was transferred from Dr. Beda to NP Kulhanek.  (Tr. 1235.)

(*Id*.)  NP Kulhanek concluded that outpatient care remained an appropriate treatment plan for Mr. Rennette and continued his Paxil and Zyprexa.  (*Id*.)

Mr. Rennette continued to meet with NP Kulhanek throughout 2021.  (Tr. 1159-66, 1189-95, 1216-23.)  Mental status findings were similar to those recorded during Mr. Rennette's October 6, 2021 visit, except he presented with a depressed mood during his October 29, 2021 visit.  (*Compare* Tr. 1161-62, 1191-92, 1218-19 *with* Tr. 1238.)  He presented to NP Kulhanek on January 21, 2022, for a video telehealth session.  (Tr. 1149-56.)  During that session, he reported his depression was better and his mood was pretty good.  (Tr. 1150.)  He denied suicidal and homicidal ideation.  (*Id*.)  He denied auditory hallucinations, but said he occasionally saw things out of the corner of his eye that were not there; he did not see anything that scared him.  (*Id*.)  He was not using alcohol.  (*Id*.)  Mental examination findings were normal.  (Tr. 1152.)  He endorsed occasional auditory and visual hallucinations, but did not appear internally stimulated.  (*Id*.)  His medications were continued to minimize decompensation.  (*Id*.)

On February 18, 2022, Mr. Rennette met with NP Kulhanek for a telehealth medication management follow-up visit.  (Tr. 1129-33.)  Mr. Rennette reported doing well with his depression and only had anxiety relating to his disability case.  (Tr. 1130.)  His psychosis was not causing him problems; he occasionally saw or heard things, but it did not scare him or cause him problems.  (*Id*.)  On examination, Mr. Rennette was euthymic, his thought process was goal-directed, linear, and coherent, his cognition was intact, his insight was good, and no impairment in judgment was noted.  (Tr. 1133.)  Mr. Rennette indicated he might need to stop Zyprexa so he could have a tilt test to assess his ongoing dizziness, but was concerned about stopping the medication because his hallucinations returned when he stopped in the past.  (Tr. 1130, 1132.)

NP Kulhanek planned to speak with Mr. Rennette's neurologist before making any medication changes.  (Tr. 1132.)  In the meantime, she continued his medications.  (*Id*.)

At his March 11, 2022 appointment, NP Kulhanek adjusted his medications because he could not perform the tilt test while taking Zyprexa.  (Tr. 1100-04.)   They planned to taper Zyprexa and start Abilify.  (Tr. 1104.)  Mr. Rennette continued to report manageable hallucinations.  (*Id*.)  On examination, Mr. Rennette's affect was constricted and his speech was soft.  (Tr. 1102-03.)  Otherwise, his mental status findings were unremarkable.  (*Id*.)

On April 11, 2022, Mr. Rennette reported to NP Kulhanek that he was doing well transitioning to Abilify, except for difficulty sleeping.  (Tr. 1054-57.)  He reported some hallucinations, but nothing that concerned him; he was euthymic did not appear internally stimulated.  (Tr. 1055, 1057.)  NP Kulhanek planned to increase Abilify for psychosis.  (*Id*.)

 When Mr. Rennette met with NP Kulhanek on May 23, 2022, he reported that things were going well.  (Tr. 1042-43.)  He occasionally caught a "glimpse of little things but nothing to freak [him] out to[o] bad."  (Tr. 1043.)  He had occasional anxiety and felt depressed when listening to certain songs.  (*Id*.)  His dizziness continued, but it had improved since starting Abilify.  (Tr. 1043, 1044.)  Except for reports of occasional hallucinations that were not command type and did not worry him too much, mental status findings were normal.  (Tr. 1043, 1044-45.)  Mental status examination findings at appointments with NP Kulhanek on June 20, 2022 (Tr. 1035) and August 15, 2022 (Tr. 983-84) were similar to those from the May 23, 2022 visit (Tr. 1044-45.)  At his August 15, 2022 visit, NP Kulhanek adjusted his medication to target his depression.  (Tr. 984.)  She instructed him to taper off Paxil and start Lexapro.  (Tr. 984.)

There appears to be a gap in treatment with behavioral health providers at Circle Health from August 2022 to September 5, 2023, when Mr. Rennette again met with NP Kulhanek.  (Tr.

2286-91.)  At that visit, NP Kulhanek prescribed Lexapro for anxiety and depression and Abilify for psychosis.  (Tr. 2286.)  Mr. Rennette felt his medications were working fine at that time. (*Id*.)  He reported auditory and visual hallucinations, which he did not pay much attention to, and minor paranoia.  (Tr. 2287.)  Mental status findings were generally unremarkable, except for the reported hallucinations and paranoia.  (Tr. 2288-89.)  He continued to report concerns about his dizziness but denied recent falls or syncope.  (Tr. 2289.)

On October 11, 2023, Mr. Rennette met with Takiyah Smith, RN, at Circle Health for a telehealth appointment.  (Tr. 2276.)  He reported his mood was "alright."  (Tr. 2277.)  He reported depression and anxiety, but said it was baseline.  (*Id*.)  His depression and anxiety were caused by boredom, so he went on walks, ate, or took naps.  (*Id*.)  He reported hallucinations but understood they were not real and used coping skills to reduce the occurrence.  (*Id*.)  His social supports included his parents, who he called daily, and his AA friends.  (*Id*.)  His sobriety anniversary date, October 24, 2022, was approaching and he was hoping to celebrate with cake or dinner.  (*Id*.)  He took a melatonin if he struggled sleeping.  (*Id*.)  He reported no changes in appetite or medication compliance.  (*Id*.)  Aside from reported hallucinations, his mental status findings were unremarkable.  (Tr. 2278-79.)  His medications were refilled.  (Tr. 2279.)

During a telehealth appointment with Jennifer Mlady, APRN, CNP, on December 1, 2023, Mr. Rennette continued to report non-command type hallucinations and minor paranoia. (Tr. 2261.)  Some of the hallucinations were bad and he had to close his eyes for a few seconds, but he knew they were not real.  (*Id*.)  He also reported passive suicidal ideation when he was overwhelmed, but he denied intent for violence or harm.  (*Id*.)  He felt he was a burden to his family at times, but his parents were a protective factor for him.  (*Id*.)  He was euthymic, cooperative and engaged.  (Tr. 2262-63.)  Although his baseline hallucinations and paranoia

15

continued, the hallucinations were not command in nature and the symptoms appeared manageable.  (Tr. 2263.)  CNP Mlady continued Mr. Rennette's medications, noted no acute safety concerns, and found Mr. Rennette appeared appropriate for outpatient care.  (*Id*.)

When Mr. Rennette attended a telehealth appointment with NP Kulhanek on January 16, 2024, he reported that his "mood [was] going good," with occasional depressive days that were potentially weather related.  (Tr. 2247.)  He also reported increased anxiety due to "hotspot difficulties."  (*Id*.)  He was taking Lexapro for anxiety and depression and Abilify for psychosis. (*Id*.)  He was still experiencing dizziness.  (*Id*.)  He endorsed fleeting suicidal ideation without intent, noting that his family was a protective factor.  (*Id*.)  He also endorsed ego-dystonic thoughts of harm towards others, but denied intent or access and denied homicidal ideation.  (*Id*.) He continued to report hallucinations, saying he saw shadows of people in his house, and reported increasing paranoia about people breaking into his house.  (Tr. 2247-48.)  On examination, he was cooperative and engaged with goal-directed, linear, and coherent thought processes, but his mood was depressed.  (Tr. 2249.)  His cognition was intact, his insight was good, and no impairment in judgment was noted.  (Tr. 2250.)  NP Kulhanek increased Mr. Rennette's Abilify dose to target his continuing depression and psychosis.  (*Id*.)

On January 26, 2024, Mr. Rennette messaged NP Kulhanek, requesting that she fill out paperwork that he needed for his Social Security Disability claim.  (Tr. 2243.)

### 2.    Relevant Opinion Evidence

#### i.    Treating Source

On March 17, 2022, NP Kulhanek authored a letter that stated she was treating Mr. Rennette for schizoaffective disorder, depressive type.  (Tr. 1096.)  She believed Mr. Rennette

continued to require disability services, including SNAP benefits, because he was unable to work due to his mental health conditions.  (*Id.*)

NP Kulhanek also completed two Mental Impairment Questionnaires: one on September 12, 2022 (Tr. 2022-2023), and the other on February 15, 2024 (Tr. 2486-87).  Both Questionnaires were checkbox style opinions in which NP Kulhanek rated Mr. Rennette's ability to perform work-related activities.[7]  (Tr. 2022-23, 2486-87.)  NP Kulhanek reported that Mr. Rennette had been seeing providers at her facility on a monthly basis since 2019 and he had treated with her monthly since October 2021.  (Tr. 2022, 2486.)

In the 2022 Questionnaire, NP Kulhanek reported she was treating Mr. Rennette for schizoaffective disorder and alcohol use disorder, and that Mr. Rennette was prescribed Abilify and Lexapro.  (Tr. 2022.)  She indicated that Mr. Rennette's medication side effects included dizziness and fatigue.  (*Id.*)  When asked to describe the clinical findings that demonstrated the severity of Mr. Rennette's impairment and symptoms, NP Kulhanek stated that Mr. Rennette was hospitalized on multiple occasions for mental health needs, and he had quit or walked off jobs due to criticism.  (*Id.*)  She opined that his prognosis was fair and that his impairment lasted or was expected to last at least 12 months.  (*Id.*)  NP Kulhanek was unable to quantify how many days Mr. Rennette would be absent from work due to his impairments or how often he would be off task due to his symptoms.  (Tr. 2023.)

As to functional abilities, NP Kulhanek opined that Mr. Rennette was seriously limited, but not precluded in the following areas: carrying out very short and simple instructions; maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; and setting realistic goals or making plans independently of others.  (Tr. 2022-23.)

---

[7] The available ratings were: unlimited or very good; limited but satisfactory; seriously limited, but not precluded; unable to meet competitive standards; and no useful ability to function.  (Tr. 2022-23, 2486-87.)

17

He was unable to meet competitive standards in the following areas: carrying out detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule; managing regular attendance and being punctual within customary tolerances; sustaining an ordinary routine without special supervision; working in coordination with or in proximity to others without being distracted by them; remembering locations and work-like procedures; understanding and remembering very short and simple instructions; interacting appropriately with the general public; asking simple questions or requesting assistance; getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; and responding appropriately to changes in the work setting.  (*Id*.)  He had no useful ability to function in the following areas: completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; understanding and remembering detailed instructions; accepting instructions and responding appropriately to criticism from supervisors; and being aware of normal hazards and taking appropriate precautions.  (*Id*.)

In the 2024 Questionnaire, NP Kulhanek said she was treating Mr. Rennette for schizoaffective disorder, depressed, and he was prescribed Abilify and Lexapro.  (Tr. 2486.)  His medication side effects included dizziness, fatigue, and upset stomach.  (*Id*.)  When asked to describe clinical findings demonstrating the severity of Mr. Rennette's impairment and symptoms, NP Kulhanek listed chronic hallucinations and paranoia.  (*Id*.)  She opined that his prognosis was fair and that his impairment had lasted or was expected to last at least 12 months.  (*Id*.)  She was again unable to quantify how many days Mr. Rennette would be absent from work due to his impairments or how often he would be off task due to his symptoms.  (Tr. 2487.)

As to functional abilities, NP Kulhanek opined that Mr. Rennette had limited but satisfactory ability in the following areas: sustaining an ordinary routine without special supervision and being aware of normal hazards and taking appropriate precautions. (Tr. 2486-87.) He was seriously limited, but not precluded, in the following areas: carrying out very short and simple instructions; understanding and remembering very short and simple instructions; asking simple questions or requesting assistance; maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; and setting realistic goals or making plans independently of others. (*Id.*) He was unable to meet competitive standards in the following areas: carrying out detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule; managing regular attendance and being punctual within customary tolerances; working in coordination with or in proximity to others without being distracted by them; remembering locations and work-like procedures; understanding and remembering detailed instructions; interacting appropriately with the general public; and responding appropriately to changes in the work setting. (*Id.*) He had no useful ability to function in the following areas: completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; accepting instructions and responding appropriately to criticism from supervisors; and getting along with coworkers or peers without distracting them or exhibiting behavioral extremes. (*Id.*)

### ii.    Consultative Examiner

On July 25, 2019, Mr. Rennette presented to Thomas Evans, Ph.D., for a psychological consultative evaluation. (Tr. 458-63.) Mr. Rennette reported he was disabled and had applied for disability due to his mental health problems. (Tr. 458.) He was living alone in an apartment.

(*Id.*)  At home, he took care of the cooking, cleaning, laundry, and grocery shopping.  (*Id.*)  He reported that he last worked in 2018, with his longest period of employment being five years at a recycling center.  (Tr. 459.)  He got along "excellent" with his coworkers when he worked and got along "good" with people in general.  (*Id.*)  On a typical day, he woke up around 10 a.m. and watched television.  (Tr. 460.)  Mental status findings were generally normal, but he reported "currently feeling depressed" and experiencing auditory and visual hallucinations.  (*Id.*)  Dr. Evans diagnosed unspecified depressive disorder, unspecified schizophrenia and related disorder, unspecified alcohol use disorder, and unspecified cannabis use disorder, noting that his "drug use muddies the clinical picture to some degree."  (Tr. 461.)

Dr. Evans provided the following functional assessment.  (Tr. 461-62.)  He opined that Mr. Rennette did not appear to have any difficulties understanding, remembering, or carrying out simple to moderately complex instructions in a workplace setting.  (Tr. 462.)  Mr. Rennette displayed good attention and concentration throughout the evaluation, with no observed psychomotor agitation or restlessness, and he was able to maintain focus without any difficulty. (*Id.*)  Mr. Rennette denied having problems getting along with fellow coworkers or bosses and denied having any difficulties getting along with authority figures or following directives.  (*Id.*) Mr. Rennette reported that his psychiatric symptoms affected him in the workplace mainly due to attendance issues and leaving work early.  (*Id.*)  Dr. Evans noted that Mr. Rennette's drug use would likely have affected his ability to respond appropriately to work pressures in a work setting.  (*Id.*)  Dr. Evans also noted that it was "somewhat questionable" whether Mr. Rennette would be able to manage his benefits if awarded given his only recent sobriety and his reported use of marijuana two months earlier.  (*Id.*)

### iii.    State Agency Psychological Consultants

On September 9, 2019, state agency psychological consultant Kristen Haskins, Psy.D., completed a Psychiatric Review Technique ("PRT") (Tr. 68-69) and Mental RFC Assessment (Tr. 70-73).  In the PRT, Dr. Haskins opined that Mr. Rennette had no limitations in his ability to understand, remember, or apply information, and moderate limitations in his ability to: interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself.  (Tr. 69.)  In the Mental RFC, Dr. Haskins opined that Mr. Rennette could: sustain short-cycle work that does not require fast-paced production demands and where he can work away from others; would need occasional flexibility of scheduled tasks and breaks within a normal workday / workweek; could interact briefly and occasionally in situations not requiring more than superficial contact with coworkers, supervisors, and the general public; should be presented supervisory feedback in a clear and supportive manner; could perform familiar tasks that can be completed independent of others in a stable setting with clear and predictable expectations; and could manage changes in routine that were infrequent and implemented with advance notice.  (Tr. 70-73.)

On reconsideration, on December 31, 2019, state agency psychological consultant Ellen Rozenfeld, Psy.D., completed a PRT (Tr. 100-01) and Mental RFC Assessment (Tr. 103-05).  In the PRT, Dr. Rozenfeld found mild limitations in Mr. Rennette's ability to understand, remember, or apply information, and moderate limitations in his ability to: interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself.  (Tr. 101.)  She affirmed Dr. Haskins's Mental RFC Assessment.  (Tr. 103-05.)

21

**C.      Administrative Hearing Testimony and Function Reports**

**1.      Plaintiff's Testimony**

**i.      September 29, 2020**

At the September 29, 2020 hearing, Mr. Rennette testified in response to questioning by the ALJ and his attorney.  (Tr. 38-51.)  He reported that he last worked as an electronics recycler.  (Tr. 40.)  He worked there for a year and a half, and the job ended in 2018.  (*Id*.)  He said he stopped working because he woke up every day with pain in his wrists and back and swelling in his knee, but left the job on good terms.  (Tr. 41.)  He also had past work as a general laborer and retail stock person.  (Tr. 41-42.)  Mr. Rennette said his employment usually ended on good terms, except he was fired from the retail stock position for being late all the time.  (Tr. 46.)

When asked why he felt he was disabled, Mr. Rennette said: he struggled with having auditory and visual hallucinations; it was difficult for him to wake up in the morning due to his medications; he had pain in his back if he stood for too long and pain in his wrists if he used his hands for too long; he had trouble concentrating and focusing; at times he had trouble understanding basic instructions; and he was easily frustrated if he could not figure something out at work.  (Tr. 42-44, 49.)  He said he would get really frustrated at work, and would yell and cuss before being told he had to tone it down.  (Tr. 43-44.)  There was one coworker that Mr. Rennette did not get along with.  (Tr. 47-48.)  According to Mr. Rennette, that coworker blamed him for everything.  (*Id*.)  Mr. Rennette talked to his boss about it and the problems stopped for about six months, but then started up again; the two of them would get into yelling matches.  (Tr. 48.)  Mr. Rennette ultimately tried to block the coworker out as much as he could.  (*Id*.)

Mr. Rennette said his hallucinations were milder with medication, but they were always present.  (Tr. 44.)  Sometimes the hallucinations stopped him from what he was doing.  (Tr. 44-

45.)  For example, he talked to a person who was not there when he was working at the electronics company; he did not realize he was talking to a person who was not there until a coworker questioned him about it.  (*Id*.)  He also took medication for his depression, which seemed to help; but he still had ups and downs.  (Tr. 51.)

Mr. Rennette took a pain pill every now and then for his back and wrist pain.  (Tr. 45.) He also had wrist braces that he wore when his wrists hurt a lot.  (*Id*.)  Sometimes his fingers and hands went numb, and he would have to shake them out or move his wrists around.  (*Id*.)

Mr. Rennette reported a sobriety date of May 31, 2020.  (Tr. 47.)  He lived alone and was able to take care of his apartment without assistance.  (Tr. 48.)  But it took extra time to do tasks around his home and he rarely finished tasks that he started.  (Tr. 50-51.)  He tended to forget about appointments unless he wrote them down on a calendar or left himself a note.  (Tr. 49-50.)

### ii.    October 12, 2022 Hearing

At the October 12, 2022 hearing, Mr. Rennette testified in response to questioning by the ALJ and his attorney.  (Tr. 626-38.)  He was living alone.  (Tr. 627.)  When asked why he felt he was disabled, Mr. Rennette said he: hallucinated; experienced lightheadedness, dizziness, and pain; did not always get along with other people; and had problems staying awake during the day and staying asleep at night.  (Tr. 629-30, 634-35.)

Mr. Rennette said that his hallucinations occurred several times a day and were mostly auditory in nature, but he also had visual hallucinations.  (Tr. 636-37.)  About once a week, he had a hallucination that really scared him.  (Tr. 638.)  His hallucinations distracted him from whatever he was trying to do at the time; he would try to remind himself they were not real, but had to take a time-out from what he was doing.  (Tr. 636-37, 638.)  A time-out could last 15 minutes or longer.  (Tr. 638.)

Regarding his lightheadedness and dizziness, Mr. Rennette was not certain that Paxil was the cause because he was still having the problem after stopping Paxil.  (Tr. 630.)  He also said he got pain in his legs and back if he sat for too long.  (Tr. 633.)  This was problematic for him, not only because of the pain, but also because he had to get up and move around, which caused lightheadedness.  (*Id.*)

Mr. Rennette had walked out of stores on occasion due to feeling overwhelmed with too many people in the store.  (Tr. 635-66.)  His medication regimen for schizophrenia and depression was recently modified to Abilify and Lexapro.  (Tr. 631.)  He said it was too early to tell the effects of the medication change.  (*Id*.)

### iii.  March 25, 2024 Hearing

At the March 25, 2024 hearing, Mr. Rennette testified in response to questioning by the ALJ and his attorney.  (Tr. 2075-83, 2085.)   He reported a new sobriety date of October 24, 2022.  (Tr. 2079-80.)  He was attending AA meetings, group therapy, and an IOP for his mental health conditions.  (Tr. 2080.)  His mental health symptoms included auditory and visual hallucinations, paranoia, and depression.  (Tr. 2080-81.)  The auditory hallucinations occurred daily, distracted him, and impacted his ability to focus.  (*Id*.)

Mr. Rennette had difficulty sleeping.  (Tr. 2082-83.)  He took melatonin every night, but still had problems falling asleep and staying asleep.  (*Id*.)  Due to his sleep problems, he was groggy, tired, irritable, and cranky during the day.  (Tr. 2083.)

Mr. Rennette still had a driver's license for identification purposes.  (Tr. 2081.)  He did not drive; his dad had been driving him places for several years.  (*Id*.)

### 2.    Function Reports

As part of his disability application process, Mr. Rennette and his father, Robert Rennette, each completed a Function Report.  (Tr. 243-50, 284-91.)  Mr. Rennette completed his on June 17, 2019 (Tr. 243-50), and his father completed his on September 20, 2020 (Tr. 284-91).

Mr. Rennette reported that his conditions limited his ability to work because: he got frustrated about not being able to bend over to pick up tools he needed for work; he got confused about which tools to use; he had to squint to see; his back hurt when he stood too long, and he had to sit down; he got angry for no reason and yelled and screamed at people, who then did not want to work with him; and he heard and saw things that were not there.  (Tr. 243.)

Mr. Rennette's father reported that Mr. Rennette's conditions limited his ability to work, stating: "inability to focus, tired, unable to get up in time, sleep pattern, self motivation."  (Tr. 284.)  He said his son drank coffee after waking up, went on a walk or two, helped with minor chores if asked, watched television, used the computer for 4-6 hours, and took naps.  (Tr. 285.)  His son was never very social and had become more isolated and introverted in recent years.  (*Id*.)  His son frequently became lightheaded upon standing and had issues with his memory, concentration, focus, and understanding some instructions.  (Tr. 289.)

### 3.    Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the March 25, 2024 hearing.[8]  (Tr. 2083-90.)  At the start of the hearing, the ALJ noted that a prior VE identified Mr. Rennette's past work as: electronics recycler, a medium, SVP 2 job; store laborer, a medium, SVP 2 job, and gate guard, a light, SVP 3 job.  (Tr. 2074-75.)  Mr. Rennette's counsel agreed that the three noted jobs still applied.  (*Id*.)  But the new VE explained that the recycling job was more appropriately classified

---

[8] Vocational Experts also testified at the two earlier hearings.  (Tr. 52-57, 639-46.)

as electronics worker, a light, SVP 2 job; this was more in line with what Mr. Rennette said he was doing at that past job, while the other one—electronics recycler or salvage laborer—was "more paper, plastic, wood kind of things, not actually electronics equipment."  (Tr. 2085-87.)

The ALJ asked the VE whether Mr. Rennette's past work could be performed by a hypothetical individual of Mr. Rennette's age, education, and work history who could: perform a full range of work at all exertional levels; carry out short-cycle tasks in a routine work setting with few changes, and no production work pace, defined as no hourly production quotas; respond appropriately to supervisors, coworkers, and work situations or tasks that do not require more than superficial interaction, meaning the work does not require negotiating with, instructing, persuading or directing the work of others; and could not perform tandem work, provide services directly to the public, or make independent plans to complete work.  (Tr. 2083-84.)  The VE testified that the gate guard and store laborer positions would be excluded as generally performed.  (Tr. 2084.)  The electronics worker position would remain available.  (Tr. 2088.)

For her second hypothetical, the ALJ reduced the exertion level to light and added that the individual could lift and carry 20 pounds occasionally and 10 pounds frequently, and could not climb ladders, ropes, or scaffolds; everything else from the first hypothetical remained.  (Tr. 2088.)  The VE testified that the gate guard and laborer of stores would be unavailable as generally performed, but the electronics worker would be available as generally performed.  (*Id*.)

The VE testified that there would be no work available if an individual was off task 20% of the workday.  (Tr. 2089.)  If the individual required flexibility in scheduling breaks up to one-third of the time, the VE testified that there would be no work available unless the employer agreed to an accommodation.  (*Id*.)  The VE also testified that employers considered arriving late

to or leaving early from work to be an absence.  (Tr. 2089-90.)  Therefore, there would be no competitive work for an individual who arrived late to work or left early once a week.  (*Id*.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is

27

capable of performing other work that exists in significant numbers in the
national economy.

20 C.F.R. §§ 404.1520, 416.920;[9]; *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the Residual Functional

Capacity ("RFC") and vocational factors to perform other work available in the national

economy.  *Id.*

## IV.    The ALJ's Decision

In her June 20, 2024 decision, the ALJ made the following findings:[10]

1.    The claimant meets the insured status requirements of the Social Security
Act through March 31, 2023.  (Tr. 2029.)

2.    The claimant has not engaged in substantial gainful activity since October
14, 2018, the alleged onset date.  (*Id.*)

3.    The claimant has the following severe impairments: schizoaffective
disorder; alcohol abuse until recent sobriety date of October 24, 2022;
medication induced near syncope and syncopal episodes; alcohol-induced
avascular necrosis; and degenerative joint disease of the left hip status-post
total hip replacement.  (Tr. 2030-33.)

4.    The claimant does not have an impairment or combination of impairments
that meets or medically equals the severity of the listed impairments in 20
C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 2033-39.)

5.    The claimant's residual functional capacity is bifurcated to reflect two
periods because the onset of claimant's severe mental impairments began
as of October 14, 2018, through the date of decision and claimant did not
develop severe physical impairments until January 11, 2023.  (Tr. 2039.)
From October 14, 2018, until January 11, 2023, the claimant had the

---

[9] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances,
citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations
found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq.,
corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. §
416.920).

[10] The ALJ's findings are summarized.

following nonexertional mental limitations on a sustained, regular and continuing basis: he can carry out short-cycle tasks in a routine work setting with few changes and no production work pace, which is defined as no hourly production quotas.  He can respond appropriately to supervisors, coworkers, and work situations for work tasks that do not require more than superficial interaction, which means that it does not require negotiating with, instructing, persuading or directing the work of others, and the occupation does not require tandem work, providing services directly to the public, or making independent plans to complete work.  (Tr. 2039-60.)  Beginning January 11, 2023, the claimant has had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) except for the following physical and mental limitations.  He cannot climb ladders, ropes, or scaffolds.  He can carry out short-cycle tasks in a routine work setting with few changes and no production work pace, which is defined as no hourly production quotas. He can respond appropriately to supervisors, coworkers, and work situations for work tasks that do not require more than superficial interaction, which means that it does not require negotiating with, instructing, persuading, or directing the work of others, and the occupation does not require tandem work, providing services directly to the public, or making independent plans to complete work.  (*Id*.)

6.  The claimant is capable of performing past relevant work as an Electronics Worker.  (Tr. 2060-61.)

Based on the foregoing, the ALJ determined that Mr. Rennette had not been under a disability, as defined in the Security Act from October 14, 2018, through the date of the decision. (Tr. 2061.)

## V.  Plaintiff's Arguments

Plaintiff presents two assignments of error.  First, he argues the ALJ failed to comply with the remand order when she improperly assessed the persuasiveness of the medical opinion evidence.  (ECF Doc. 8, pp. 1, 13-21; ECF Doc. 11.)  Second, he argues the ALJ's finding that Mr. Rennette could perform his past relevant work or other jobs at the light level of exertion was not supported by substantial evidence.  (ECF Doc. 8, pp. 1, pp. 21-25.)

# VI.  Law & Analysis

## A.  Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the

Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.**     **First Assignment of Error: The ALJ Did Not Adequately Explain Her Evaluation of the State Agency Psychological Consultants' Opinions Pursuant to SSR 96-8p**

In his first assignment of error, Mr. Rennette argues that the ALJ failed to properly evaluate the persuasiveness of various medical opinions as required by the Appeals Council's remand order of July 21, 2023.  (ECF Doc. 8, pp. 13-21; ECF Doc. 11.)  With respect to the medical opinions of the state agency psychological consultants in particular, Mr. Rennette argues that the ALJ failed to adequately explain her rationale for not including certain limitations in the RFC as required by SSR 96-8p, even though she found the opinions partially persuasive.[11]  (ECF Doc. 8, pp. 19-20; ECF Doc. 11, pp. 5-6.)  The Commissioner responds that the path of the ALJ's reasoning can be readily traced by reviewing her decision.  (ECF Doc. 10, pp. 15-16.)

---

[11] Because the Court finds remand appropriate based on the ALJ's analysis of the medical opinions of the state agency psychological consultants, the Court will not address Plaintiff's arguments regarding the medical opinions of consultative examining psychologist Dr. Evans or treating provider NP Kulhanek.  On remand, the ALJ should ensure that she clearly articulates the rationale supporting her persuasiveness findings as to all of the medical opinions, including the medical opinions of Dr. Evans and NP Kulhanek.

The ALJ provided the following analysis in support of her finding that the medical opinions of the state agency psychological consultants were partially persuasive:

> The undersigned is partially persuaded by the State Agency psychological consultants' mental assessments through the reconsideration determination level through January 3, 2020 []. Regarding the opinion of Kristen Haskins, Ph.D., from the initial determination level in September 2019, the undersigned is partially persuaded by her psychiatric review technique assessment because, while the undersigned finds the claimant's previous inconsistently-treated mental impairments and his previously-active drug and alcohol use through October 2022 caused slightly more restrictive limitations in his ability to understand, remember, or apply information than she opined (i.e., at the up to mild functional severity), the undersigned finds the totality of the evidence continues to support her opinion that the claimant's severe mental impairments caused him moderate limitations in the remaining three "paragraph B" criteria []. The undersigned is not persuaded by Dr. Haskin's function-by-function medical-vocational assessment and, therefore, has not adopted it because she uses vague, imprecise and not vocationally appropriate language to assess the claimant's residual mental capacity. Moreover, she did not adequately explain or support the limits regarding interacting with others. For instance, she opined the claimant had to "work away from others," and "briefly and occasionally" interact with others that does not require more than "superficial contact" and "supervisory feedback should be presented in a clear and supportive manner." Also her opinion regarding interaction with others is not substantiated by the medical record as he was consistently noted to be cooperative, no mania, denying aggression and violence. [] She opined the claimant would have moderate sustainability issues that would limit him to short-cycle tasks, which do not require fast-paced production demands, would restrict him to working away from others," and would permit him occasional flexibility of scheduled tasks and breaks within a normal workday/work week []. The undersigned finds that these restrictions include vague, imprecise terminology that she did not define or explain and are not used by the DOT to describe work duties, skills or environments. Moreover, the stated limits contradict her opinion that the claimant is functioning in the range of average intelligence, and it is not consistent with her opinion that the claimant does not have any limitations in understanding, remembering or applying information. Next, she opined the claimant's mental impairments restricted him to "brief, occasional," and "no more than superficial" interaction with coworkers, supervisors, and the public, but she does not define what superficial means as to how these limitations in work-related social interactions would translate to a customary work environment in the national economy in the context of her limitations that he work away from others. Similarly, she used vague, imprecise terminology when she opined any supervisory feedback that the claimant would receive must be "clear and supportive." She not only failed to define, explain or support this opinion but it also suggests vocational requirements that are outside the scope of the medical-vocational guidelines regarding moderate customary work-related interactions. This qualitative language suggests requirements on the supervisor's conduct and interactive abilities, which

are not at issue in this case nor appropriately addressed and included in an RFC. In sum, the undersigned finds Dr. Haskins's psychiatric review technique assessment is generally consistently with the evidence as a whole, but her functional assessment fails to comply with appropriate medical-vocational terminology that the regulations require when assessing a claimant's residual functional capacity pursuant to the Social Security Act and hence, the undersigned did not use most of her statements in assessing the claimant's residual functional capacity.

The undersigned is partially persuaded by the State Agency psychological consultant Ellen Rozenfeld, Psy.D., from January 2020 []. Specifically, while her psychiatric review technique assessment is substantiated by the totality of the medical evidence, including her opinion that the claimant has experienced a slightly more restrictive mild limitation in understanding, remembering and applying information than Dr. Haskins's opined, the undersigned is not persuaded by her adoption of Dr. Haskins's mental residual functional capacity assessment verbatim without providing any clarifications as to the vague and imprecise terminology that fail to comport with appropriate regulatory medical-vocational guidelines under the Social Security Act, as the undersigned explained in her assessment of Dr. Haskins's opinion. Accordingly, the undersigned has relied instead on the totality of the evidence and guidance in the medical-vocational rules and regulations to assess the claimant's mental functional capacity for the current adjudicating period [].

(Tr. 2057-58 (citations omitted) (emphasis added).)  Having deemed the state agency medical opinions partially persuasive in light of their "vague, imprecise and not vocationally appropriate language," the ALJ concluded that Mr. Rennette had the RFC to:

carry out short-cycle tasks in a routine work setting with few changes and no production work pace, which is defined as no hourly production quotas.  He can respond appropriately to supervisors, coworkers, and work situations for work tasks that do not require more than superficial interaction, which means that it does not require negotiating with, instructing, persuading or directing the work of others, and the occupation does not require tandem work, providing services directly to the public, or making independent plans to complete work.

(Tr. 2039-40.)

Mr. Rennette argues that the ALJ erred when she failed to include some of the state agency consultants' stated limitations in the RFC and failed to explain why the limitations were not adopted pursuant to Social Security Ruling 96-8p.  (ECF Doc. 8, pp. 19-20; ECF Doc. 11, pp. 5-6.)  In particular, she challenges the ALJ's failure to adopt—or alternately to explain her

33

failure to adopt—the state agency consultants' finding that Mr. Rennette would "need occasional flexibility of scheduled tasks and breaks, within a normal workday / workweek."[12]  (*Id.*; *see* Tr. 71, 104.)  Although the Commissioner argues that "the path of the [ALJ's] reasoning can be readily traced" with respect to the state agency opinions, he does not offer specific arguments to elucidate the ALJ's reasoning for not adopting a limitation consistent with the stated need for "occasional flexibility of scheduled tasks and breaks."  (ECF Doc. 10, pp. 15-16.)

Of course, an ALJ "is not required to recite the medical opinion of a physician verbatim in [her] residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009).  Indeed, even where an opinion was given great weight under prior regulations, "there [was] no requirement that [the] ALJ adopt a state agency psychologist's opinions verbatim; nor [was] the ALJ required to adopt the state agency psychologist's limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015).

Nevertheless, Social Security Ruling 96-8p requires the ALJ to consider all medical opinions in her RFC assessment and, where her assessment "conflicts with an opinion from a medical source," she "must explain why the opinion was not adopted." SSR 96–8p, *Assessing Residual Functional Capacity in Initial Claims*, 61 Fed. Reg. 34474, 34478 (July 2, 1996); *see Fleischer*, 774 F. Supp. 2d at 881 (citing SSR 96-8p).  And where it has been shown that "SSA

---

[12] Mr. Rennette also challenges the ALJ's failure to adopt, or to explain her failure to adopt, the state agency consultants' finding that "supervisory feedback should be presented in a clear and supportive manner."  (ECF Doc. 8, p. 20; *see* Tr. 72, 104.)  Because the Court finds remand appropriate on other grounds, this additional argument need not be addressed.  Nevertheless, it is observed that the ALJ provided a detailed discussion of her reasons for not adopting this limitation.  In addition to her general observation that the state agency consultants' language was generally "vague, imprecise, and not vocationally appropriate," the ALJ specifically explained that the consultants "used vague, imprecise terminology when [they] opined any supervisory feedback that the claimant would receive must be 'clear and supportive,'" that they "failed to define, explain or support this opinion" and suggested "vocational requirements that are outside the scope of the medical-vocational guidelines regarding moderate customary work-related limitations," and that they used "qualitative language" that "suggest[ed] requirements on the supervisor's conduct and interactive abilities, which are not at issue in this case nor appropriately addressed or used in an RFC."  (Tr. 2057-58.)  Thus, to the extent that the relevant limitation may be construed as in conflict with the RFC adopted by the ALJ, the detailed explanation offered by the ALJ is sufficient to comply with her obligation to explain why the limitation was not adopted under the SSR 96-8p standard discussed herein.

fail[ed] to follow its own regulations," the Sixth Circuit has explained that the "decision of the Commissioner will not be upheld" if the "error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746 (citing *Wilson*, 378 F.3d at 546–47)) (internal quotation marks omitted).

Under this standard, the questions before the Court are: (1) whether the RFC conflicts with the limitation, so that the ALJ must explain why she adopted a conflicting limitation under SSR 96-8p; (2) if so, whether the ALJ adequately explained why she did not adopt the relevant limitation; and (3) if not, whether the ALJ's failure to comply with SSR 96-8p prejudiced Mr. Rennette on the merits or deprived him of a substantial right under *Rabbers*, 582 F.3d at 651.

As to the first question, the state agency consultants opined that Mr. Rennette would "need occasional flexibility of scheduled tasks and breaks, within a normal workday / workweek." (Tr. 71, 104.) The RFC adopted by the ALJ established that Mr. Rennette could "carry out short-cycle tasks in a routine work setting with few changes and no production rate work pace" as defined in the RFC (Tr. 2039-40), but did not provide for any sort of flexibility with respect to the need for Mr. Rennette to perform scheduled tasks or to take scheduled breaks. Thus, a plain reading of the medical opinions and the RFC support a finding that the ALJ adopted an RFC that conflicted with that portion of the state agency medical opinions.

Turning to the second question, the Commissioner broadly asserts that the ALJ's reasoning can be readily traced by reviewing her written decision. Indeed, the ALJ did explain that various of the state agency consultants' limitations—including the limitation at issue here— "include[d] vague, imprecise terminology that [the ALJ] did not define or explain" and which were "not used by the DOT to describe work duties, skills or environment." (Tr. 2057.) Further, because the state agency psychological consultants did not "provid[e] any clarifications as to the

35

vague and imprecise terminology that fail[s] to comport with appropriate regulatory medical-vocational guidelines under the Social Security Act," the ALJ explained that she "relied instead on the totality of the evidence and guidance in the medical-vocational rules and regulations to assess the claimant's mental [RFC] for the current adjudicating period." (Tr. 2058.) In other words, the ALJ highlighted the vague nature of the language used in the consultants' opinions, and the inconsistency of that language with the vocational terminology used in the DOT, and explained that she based the RFC language instead on her own assessment of the evidence and knowledge of "the medical-vocational rules and regulations." (*Id.*)

Considered generally, the ALJ's explanation provides context for her use of RFC language that is different from, but in many ways parallel to, the language of the state agency consultants' opinions. Considered specifically in the context of the limitation to "occasional flexibility of scheduled tasks and breaks," however, the ALJ's general explanations are less illuminating. Certainly, "occasional flexibility of scheduled tasks and breaks" may be accurately described as vague and lacking in a clear vocational definition. Although "occasional" has a specific meaning in the DOT, it is not entirely clear what "occasional flexibility" would mean in the vocational context. Nevertheless, the general intent behind the stated limitation may still be gleaned from its plain language—that Mr. Rennette's mental impairments may sometimes cause him to be unable to perform tasks as scheduled and/or to require unscheduled breaks. With that in mind, the ALJ did not adopt specific language in her RFC to account for limitations in Mr. Rennette's ability to perform tasks as scheduled or his need for additional unscheduled breaks. (*See* Tr. 2039-40.) Likewise, the ALJ did not offer an explanation for her decision not to incorporate such limitations into the RFC. (*See* Tr. 2057-58.) This Court must therefore find that the ALJ failed to comply with the requirements of SSR 96-8p when she did not explain her

decision not to incorporate this portion of the state agency psychological opinions in the RFC. *See Kinney v. Comm'r of Soc. Sec.*, No. 23-3889, 2024 WL 2273365, at *3 (6th Cir. May 20, 2024) ("Without any limitation related to flexible break scheduling, the RFC conflicted with Dutt's medical opinion concluding such flexibility would be necessary, and the ALJ was obligated to explain the omission.").

The final question before this Court is therefore whether the ALJ's failure to follow the requirements of SSR 96-8p in this instance prejudiced Mr. Rennette on the merits or deprived him of a substantial right. *See Rabbers*, 582 F.3d at 651. Here, Plaintiff's counsel questioned the VE regarding the potential for flexibility in break schedules in unskilled work, as follows:

> [Counsel] Is it correct that in terms of an employee/employer relationship [sic] is expected to abide by the break schedule set by the employer?
>
> [VE] Generally, most employers will set a schedule or have an individual - - let them know when to take a break.
>
> [Counsel] Is that particularly true with unskilled work?
>
> [VE] I would say it's more common with that because of the nature of the work and needing to keep production going or keep the work going until they have proper persons or - - you know, enough people doing the work.
>
> [Counsel] So in light of the nature of needing to keep the production moving, if the hypothetical required flexibility in scheduling breaks up to a third of the time, would they remain competitive or would they remain - - or be not competitive?
>
> [VE] What you're describing, in my opinion and based on my experience, is more akin to non-competitive - - something that would be non-competitive, unless the employer decided to accommodate it.

(Tr. 2089.) Thus, the VE testified that an RFC limitation parallel to the one set forth in the state agency psychological opinions would preclude competitive work. This suggests that Mr. Rennette was prejudiced on the merits when the ALJ did not adopt some form of the relevant limitation into the RFC.

The fact that SSR 96-8p only required an explanation for the ALJ's decision not to adopt the limitation, instead of requiring the ALJ to adopt the limitation, does not change this analysis. "In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010).  As the Sixth Circuit explained in *Kinney*, the ALJ's finding that the state agency opinions were partially persuasive without explaining why she omitted the flexible task / break language from the RFC left this court with "no way . . . to know if the RFC accurately portrayed [Mr. Rennette]'s impairments and whether the VE's opinion reflected [his] true employability." *Kinney*, 2024 WL 2273365, at *4. Although the ALJ was not required to incorporate the relevant limitation into the RFC, the Court finds that her "failure to do so without explaining its omission warrants reversal." *Id.*

For the reasons set forth above, the Court is unable to meaningfully review the ALJ's decision to determine whether it is supported by substantial evidence because the ALJ failed to sufficiently explain—as required by SSR 96-8p—why she did not incorporate an RFC limitation requiring flexibility in performing tasks and/or taking breaks, as contemplated in the state agency psychological opinions.  Accordingly, the Court remands the decision for further proceedings consistent with this Order.  Given that remand is necessary to correct this error, the Court declines to address the other asserted errors.

## VII.   Conclusion

For the foregoing reasons, the final decision of the Commissioner is **VACATED** and **REMANDED**, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Order.  On remand, the ALJ should clearly articulate the rationale for her findings

regarding the persuasiveness of the medical opinions and comply with SSR 96-8p's requirement that she explain any decisions not to adopt medical source opinions that conflict with the RFC.

September 30, 2025

*/s/Amanda M. Knapp*

AMANDA M. KNAPP
United States Magistrate Judge